ORIGINAL

AUSA: Diarra M. Guthrie

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

JOSE A. MENA, JR.,

Defendant.

**COMPLAINT**

Violations of 21 U.S.C. §§ 841, 846

COUNTY OF OFFENSE:
NEW YORK

24 MAG 4151

SOUTHERN DISTRICT OF NEW YORK, ss.:

HASAN IQBAL, being duly sworn, deposes and says that he is a Task Force Officer with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and charges as follows:

**COUNT ONE**
**(Conspiracy to Distribute Narcotics)**

1. In or about November 2024, in the Southern District of New York and elsewhere, JOSE A. MENA, JR., the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that JOSE A. MENA, JR., the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

3. The controlled substance involved in the offense was 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4. I am a Task Force Officer with HSI. I have been personally involved in this investigation. This affidavit is based on my investigation, my conversations with other law enforcement officers and other individuals, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.      Based on my involvement in this investigation; my conversations with other law enforcement officers involved in this investigation; my review of reports and other records, including commercial and law enforcement databases; and my training and experience, I have learned the following, in substance and in part:

a.      On or about November 27, 2024, a narcotics-detection dog[1] alerted on a United Parcel Service ("UPS") parcel (the "Parcel") at a UPS location in the Bronx, New York, and thereafter, law enforcement officers and I transported the package to another location (the "Facility") at John F. Kennedy International Airport ("JFK Airport"). The Parcel was addressed to "Jose Antonio" at a residence in northern Manhattan, New York (the "Address"), and had a return address from Puerto Rico.

b.      I and other members of law enforcement reviewed law enforcement databases and learned that the Address listed on the Parcel was not associated with the name "Jose Antonio."

c.      Several hours later, JOSE A. MENA, JR., the defendant, entered the Facility and provided a New York State driver's license with the name "Jose A. Mena, Jr." and a photograph that matched the appearance of MENA. MENA claimed ownership of the Parcel and asked if he could pick it up. I and other members of law enforcement handed the package to MENA, at which point he started to walk away. As he started walking away, I and other members of law enforcement asked him to set the Parcel down. At that time, MENA explained that the Parcel contained clothes, for his sick mother, and a safe, which he needed immediately.

d.      After being advised of and waiving his *Miranda* rights, MENA stated, in sum and substance, that he had shipped the Parcel from Puerto Rico to himself, at the Address where he resides in Manhattan. He said he had flown down to Puerto Rico from JFK Airport early in the morning on or about November 25, 2024 and had returned to New York later the same day. He stated that the Parcel contained clothes, including those he had purchased for his mother, as well as a safe, which he had purchased at a cheap price in Puerto Rico and intended to sell in Manhattan for a profit. MENA also indicated that he had come to the Facility because UPS had told him the Parcel was located there.[2]

---

[1] Based on conversations with other law enforcement officers, I have learned that Puma is a German Shepherd who was originally certified as a narcotics-detection canine in or around June 2024 by U.S. Customs and Border Protection. Puma was certified to detect the odors of cocaine, heroin, ecstasy, and methamphetamines, as well as their derivatives. Since that time, Puma has been regularly and successfully used by law enforcement to detect narcotics, including during the inspection of packages, suitcases, automobiles, and residences. Before Puma was first certified, and during the training that he has received since then, he has been exposed to numerous different objects, some of which have contained narcotics, and others of which have not. Puma has been trained to differentiate between those categories of objects, and to give his law enforcement handlers a positive indication (i.e., to "alert") if he detects narcotics odors. Puma has generally proven reliable in the field.

[2] To my knowledge, prior to MENA's arrival at the Facility, neither me, nor any other member of law enforcement, informed UPS of the exact location of the Parcel at that time.

e. MENA confirmed verbally and in writing that he consented to a search of the Parcel by me and other members of law enforcement. The Parcel contained clothing items, as well as the safe (the "Safe") depicted immediately below:

f. Other members of law enforcement and I asked MENA whether he would open the Safe, but he initially refused. However, after leaving MENA in the interview room for several minutes, me and other members of law enforcement reentered the interview room, asked why MENA refused to open the Safe, and, at that point, MENA confirmed verbally and in writing that he consented to a search of the Safe found in the Parcel.

g. After opening the Safe, me and other members of law enforcement found three individually wrapped bricks, each bearing a stamp with interlocking C's, along with 2 Apple AirTags,[3] as depicted below:

[3] Based on my training and experience, I know that an Apple AirTag is a commercially available GPS tracking device that allows a user to identify the GPS location of the AirTag anywhere in the world.





  h. Agents field-tested a sample of the substance from the bricks, which tested positive for cocaine. In total, the bricks weighed approximately 3.288 kilograms.

6. Based on my involvement in this investigation; my conversations with other law enforcement officers involved in this investigation; my training and experience; and my review of the cellphone of MENA, the defendant, as well as my conversations with other members of law enforcement, I have learned the following:

a. I and other members of law enforcement showed MENA surveillance videos from on or about November 25, 2024, which was obtained from UPS, depicting three individuals walking into a UPS Store in Puerto Rico (the "UPS Store") with two packages. MENA acknowledged that he had been at a UPS Store in Puerto Rico with Individual-1 and Individual-2. MENA identified himself in a video, indicating that he was carrying the Parcel and had mailed it

to himself that day. MENA also identified two other individuals ("Individual-1" and "Individual-2"), one of whom was carrying a second package that Individual-1 mailed out ("Parcel-2"). Still images of the surveillance video involving MENA are depicted immediately below:

 

    b.  MENA stated, in sum and substance, Individual-1 had been tracking the Parcel through the AirTags' geolocation information and told MENA to go to the address where the Parcel seemed to be located, which is why MENA came to pick up the Parcel from the Facility. He said that Individual-1 paid him approximately $500 to ship the Parcel from Puerto Rico to Manhattan, and after the Parcel arrived in Manhattan, his job was to collect the Parcel from Manhattan and deliver it to a location to be provided by Individual-1. MENA also indicated that Individual-1 and Individual-2 had shipped Parcel-2 from Puerto Rico to Florida while in the UPS Store with MENA on or about November 25, 2024.

    7.  Based on my involvement in this investigation; my conversations with other law enforcement officers involved in this investigation, including those in Florida; and my review of reports and other records, I have learned the following, in substance and in part:

    a.  Parcel-2, sent from the UPS Store in Puerto Rico, had been intercepted by law enforcement officers in Florida after a narcotics-detection dog alerted on the parcel. Law enforcement officers then obtained a judicially authorized search warrant to open Parcel-2, which they did.

    b.  Parcel-2 contained a substantially similar safe to the one found within the Parcel sent by MENA, as depicted in the following still image:



c. In the safe in Parcel-2 were two individually wrapped bricks, each bearing a stamp with interlocking C's and one which had an Apple AirTag attached, as depicted in the following:





        d. Agents field-tested a sample of the substance from the bricks, which tested positive for cocaine. In total, the bricks weighed approximately 2.1 kilograms.

8. During his interview with law enforcement, MENA, the defendant, provided verbal and written consent to search his cellphone. A search of that cellphone revealed, among other things:

a. Screenshots of a boarding pass issued to "Jose Mena" departing on or about November 25, 2024 from JFK Airport to San Juan, Puerto Rico, of an AirTag notification showing a location in San Juan, Puerto Rico on or about November 25, 2024, and of a UPS email notification regarding the delivery status of the Parcel, as depicted below:

  

b. Communications with others, including Individual-1 and Individual-2. In one set of communications, MENA corresponded with Individual-1, with whom MENA discussed the location of the Parcel on or about November 27, 2024. That afternoon, MENA shared with Individual-1 an AirTag notification at or around the Facility where MENA ultimately went to pick up the Parcel later that day. In addition, MENA and Individual-1's communications made reference to Individual-1 sending a "key," which MENA told Individual-1 to send immediately.[4]

[4] When asked about the "key" reference, MENA indicated that he was telling Individual-1 to send a key to another individual that would open the safe that was shipped in Parcel-2 to Florida.

WHEREFORE, I respectfully request that JOSE A. MENA, JR., the defendant, be imprisoned or bailed, as the case may be.

HASAN IQBAL
Task Force Officer
Homeland Security Investigations

Sworn to me this
30 day of November, 2024

THE HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK